FILED

2025 Nov-03  AM 11:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **TIGER MANAGEMENT, LLC,** | ) | |
| **and DAKOTA PROPERTIES,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Plaintiffs/Counter** | ) | |
| **Defendants,** | ) | **Case No.: 7:25-cv-1312-AMM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CIRCLE K STORES, INC.,** | ) | |
| | ) | |
| **Defendant/Counter** | ) | |
| **Claimant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the court on two motions: (1) a Motion for Partial Summary Judgment or for Partial Findings and Partial Judgment Thereon filed by plaintiffs Tiger Management, LLC and Dakota Properties, LLC, Docs. 20–21, 23–25, 30, and (2) a Motion for Partial Summary Judgment filed by defendant Circle K Stores, Inc, Doc. 28. The motions are fully briefed. *See* Docs. 31, 33. For the reasons stated below, Circle K's motion is **GRANTED**, and the plaintiffs' motion is **DENIED**.

## I. BACKGROUND

These are the undisputed material facts:

1.    In September 2005, The Pantry, Inc. entered into a series of long-term leases with Chatham Enterprises, LLC to operate seven gas stations and

convenience stores in west Alabama. *See* Docs. 6-1 to 6-7; Docs. 8-1 to 8-7. Six of the seven stores are in Brookwood, Cottondale, Northport, or Tuscaloosa, in Tuscaloosa County, Alabama. *See* Docs. 6-2 to 6-7. And the seventh store is in Knoxville, in Greene County, Alabama. *See* Doc. 6-1.

2.    In 2005, the parties signed two sets of leases as part of a larger asset purchase agreement between Pantry, Chatham, and Chatham Oil, Inc. *See* Doc. 22-1 at 5–7, 10. The first set of signed leases were held in escrow so that Pantry could fulfill its obligations before the transaction closed. *See id.* at 5.

3.    The leases provide for an initial fifteen-year term and automatic renewal every five years until the lease ends in 2049–50, unless Pantry opts out of the automatic renewal. *See* Doc. 6-1 at 2–3; Doc. 6-2 at 2–3; Doc. 6-3 at 2–3; Doc. 6-4 at 2–3; Doc. 6-5 at 2–3; Doc. 6-6 at 3; Doc. 6-7 at 3; Doc. 8-1 at 1, 3; Doc. 8-2 at 1, 3; Doc. 8-3 at 1, 3; Doc. 8-4 at 1, 3; Doc. 8-5 at 1, 3; Doc. 8-6 at 2; Doc. 8-7 at 2.

4.    The leases also provide that "[Pantry] is and shall remain and be the owner and operator of all Petroleum Equipment" used to operate the gas stations at each location. Doc. 6-1 at 4; Doc. 6-2 at 4; Doc. 6-3 at 4; Doc. 6-4 at 4; Doc. 6-5 at 4; Doc. 6-6 at 4; Doc. 6-7 at 5; Doc. 8-1 at 4; Doc. 8-2 at 4; Doc. 8-3 at 4; Doc. 8-4 at 4; Doc. 8-5 at 4; Doc. 8-6 at 4; Doc. 8-7 at 5. But "[o]ne hundred twenty (120) days prior to the expiration of [the leases], [the] Landlord" may "require

2

[Pantry] to remove all Petroleum Equipment located on the Premises" or "purchase the Petroleum Equipment located on the Premises from [Circle K]." Doc. 6-1 at 6; Doc. 6-2 at 6; Doc. 6-3 at 6; Doc. 6-4 at 6; Doc. 6-5 at 6; Doc. 6-6 at 6; Doc. 6-7 at 6; Doc. 8-1 at 6; Doc. 8-2 at 6; Doc. 8-3 at 6; Doc. 8-4 at 6; Doc. 8-5 at 6; Doc. 8-6 at 6; Doc. 8-7 at 6.

5.    The first set of leases bears Chatham's signature dated September 12, 2005, and Pantry's signature dated September 13, 2005. *See* Doc. 8-1 at 34–36; Doc. 8-2 at 32–33; Doc. 8-3 at 31–32; Doc. 8-4 at 31–32; Doc. 8-5 at 31–32; Doc. 8-6 at 32–33; Doc. 8-7 at 33–34.

6.    The second set of leases, in one place, bears both parties' signatures dated September 23, 2005. *See* Doc. 6-1 at 32–33. In other places, the leases bear Chatham's signature dated September 23, 2025, and Pantry's signature dated September 13, 2025. *See* Doc. 6-2 at 31–32; Doc. 6-3 at 31–32; Doc. 6-4 at 31–32; Doc. 6-5 at 31–32; Doc. 6-6 at 32–33; Doc. 6-7 at 32–33.

7.    In a letter exchanged after the parties signed the first set of leases, Pantry's counsel advised Chatham that the leases would "only become effective when all the conditions to Closing" were satisfied. Doc. 22-1 at 10. An officer for Chatham "[a]greed to and accepted" that representation on September 15, 2005. *Id.* at 11.

8.    Pantry, Chatham, and Chatham Oil, Inc., closed the transaction on September 22 and 23, 2005. *Id.* at 35–36.

9.    Pantry took possession of the leaseholds on September 22, 2005. Doc. 28 at 7; Doc. 30 at 28. It thereafter sold its interest in the leaseholds to Circle K. *See* Doc. 22-2.

10.   Pantry recorded memoranda of the leases for the Tuscaloosa County stores in the Tuscaloosa County Probate Court on September 21, 2006, *see* Docs. 6-11 to 6-16, and a memorandum of the lease for the Knoxville store in the Greene County Probate Court on September 22, 2006, *see* Doc. 6-10.

11.   Later, Chatham assigned its interest in the leaseholds to Tiger Management, LLC, and Dakota Properties, LLC. Doc. 17 ¶ 9.

12.   Richard Mayers controls Tiger Management and "has authority to act on behalf of Dakota [Properties] with respect to the leases involved in this litigation." Doc. 20-1 ¶¶ 2–3. Mr. Mayers also controls Midstates Petroleum Company, LLC, a business owned by another corporation that "enters into certain fuel contracts with gasoline product providers for the provision of gasoline to be sold in retail outlets like the 'Leaseholds' at issue in this case." *Id.* ¶ 3. Midstates is not a party to this lawsuit. *See* Doc. 17.

13.   In February 2023, Tiger Management's counsel represented to Circle K that three of the leases would terminate on September 21, 2025, and could not

4

be renewed because the leases were not timely recorded under Alabama law. Doc. 20-6 at 1.

14.  Circle K did not respond to Tiger Management, Doc. 30 at 32, and instead in December 2024 communicated to Midstates its intent to exercise the renewal option on the Knoxville store. Doc. 6-17 at 3. Midstates, through the same counsel as Tiger Management, reiterated its earlier position that the renewal options were void under Alabama law. *Id.* at 2. Separately, Tiger Management demanded that Circle K vacate the leaseholds on September 21, 2025, reiterating that the leases were not timely recorded under Alabama law. *See* Doc. 6-18 at 2–3.

15.  On May 29, 2025, Circle K sent letters to Tiger Management and Dakota Properties confirming receipt of the demands to vacate the premises at the end of the lease term. Doc. 21-3; Doc. 21-4. In those letters, Circle K stated that "Landlord's position is contrary to Tenant's desires to exercise its option under the respective Lease Agreements," but "Tenant intends on complying with Landlord's stated request . . . [to] vacate the Premises in accordance with each Lease Agreement." Doc. 21-3 at 1; Doc. 21-4 at 1. Circle K also stated that it was "interested and hopeful that a commercially reasonable and mutually agreeable extension of the term is possible and would welcome a discussion between the business parties." Doc. 21-3 at 2; Doc. 21-4 at 2.

16.   Circle K also represented at that time that it would "begin coordinating . . . the removal of the Petroleum Equipment" that it owned under the leases, as Tiger Management and Dakota Properties had not exercised their option to purchase the equipment. Doc. 21-3 at 2; Doc. 21-4 at 1. Circle K reiterated this position in late-July 2025. Doc. 23-6 at 1–2. Tiger Management considered Circle K's position on removing Petroleum Equipment a "classic 'bluff,' designed to try to strong-arm Tiger [Management] and Dakota [Properties] into negotiating a series of extensions of the Lease[s]." Doc. 20-1 ¶ 12.

17.   Dakota Properties and Tiger Management thus began soliciting new tenants and developing plans to rehabilitate the leaseholds. *Id.* ¶ 7. They signed leases with various tenants from July 7 to 17, 2025, intending for the tenants to occupy the leaseholds after Circle K's leases expired. *Id.* ¶ 8. They also purchased new gasoline pumps and software systems "for all of the various leaseholds" from PetroServe, an entity controlled by Mr. Mayers. *Id.* ¶ 13; *see* Doc. 32-3. And they signed rebranding agreements with Texaco and Chevron and ordered new signage for the leaseholds. Doc. 20-1 ¶¶ 14–15.

18.   In the meantime, Dakota Properties and Tiger Management filed this suit against Circle K in the Tuscaloosa County Circuit Court on July 3, 2025. *See* Doc. 1-1. Dakota Properties and Tiger Management sought a judgment granting them back rent, declaring that they had a right to repurchase the Petroleum

6

Equipment pursuant to the lease terms, and declaring that certain gasoline canopies fell under the leases' definition for Petroleum Equipment. *Id.* at 9, 11. They asked the court to determine the appropriate price for the Petroleum Equipment. *Id.* at 11. Circle K removed the case to this court. *See* Doc. 1 at 1.

19.   Circle K counterclaimed, seeking (1) a declaratory judgment that the leases are valid under Alabama law; (2) damages for breach of contract, ejectment, and breach of the warranty of quiet enjoyment; and (3) alternatively, damages for unjust enrichment. Doc. 2 ¶¶ 32–52. Circle K then moved for a temporary restraining order, as the demanded move-out date was quickly approaching. Doc. 6.

20.   The parties agreed to maintain the status quo, with Circle K remaining in possession of the leaseholds, so that the parties could present cross motions for partial summary judgment on an agreed, expedited timetable. Docs. 20, 28, 30. Those motions are fully briefed. Docs. 31, 33.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the

nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## IV. ANALYSIS

### A. Validity of the Leases

Alabama law sets a deadline for recording leases that last longer than twenty years. *See* Ala. Code § 35-4-6. If such a lease—or memorandum of the lease—is not recorded within one year of its execution, it is void for any excess period over twenty years. *See id.* Specifically, Alabama law states:

> Leases for more than 20 years shall be void for the excess over said period unless the lease or a memorandum thereof is acknowledged or approved as required by law in conveyances of real estate and recorded within one year

> after execution in the office of the judge of probate in the
> county in which the property leased is situated.

*Id.* The first question in this case is whether the lease renewal options are void because the parties did not timely record the memoranda of the leases.

"[F]ederal courts are bound by a state supreme court's interpretation of state law," *United States v. Hill*, 799 F.3d 1318, 1322 (11th Cir. 2015), and all parties agree that the Alabama Supreme Court has addressed what triggers the one-year deadline. *See* Doc. 30 at 28; Doc. 33 at 18–19; Doc. 6 at 13 n.2. The parties agree that under Alabama law, "the one-year time clock under Ala. Code § 35-4-6 does not begin running on a lease until the tenant is actually put into possession of the leasehold." Doc. 30 at 28 (citing *Byrd Cos., Inc. v. Birmingham Tr. Nat'l Bank*, 482 So. 2d 247, 254–55 (Ala. 1985)); Doc. 33 at 18–19; Doc. 6 at 13 n.2. In *Byrd*, the court addressed a lease that "contain[ed] no definite commencement date." 482 So. 2d at 252. The lease contemplated a subsequent agreement setting the commencement date. *Id.* Within a year of that subsequent agreement—but more than a year after the initial lease—the parties recorded the instruments. *Id.* at 254–55.

In holding that the clock did not start running until the actual commencement date, the court stated that "[w]hen a stipulated event must occur before an otherwise validly created landlord-tenant relationship is to commence, the relationship is not established until such event occurs." *Id.* at 254 (cleaned up). "The relationship, however, cannot begin until the tenant has the right to possession." *Id.* (cleaned up).

Before the tenant has the right to possession, "the arrangement between the parties is not one of landlord and tenant though the agreement they have entered into may impose current obligations on one or the other." *Id.* (cleaned up). The one-year recording deadline "is silent with respect to an *interesse termini*—that interest which arises prior to the leasehold interest of an estate for a term of years to commence *in futuro*." *Id.* at 255.

So under Alabama Code § 35-4-6, the one-year recording clock does not start running until the tenant has the right to possession, and no party to this case disputes that. Doc. 30 at 28; Doc. 33 at 18–19; Doc. 6 at 13 n.2; Tr. at 25.[1] Nor does any party dispute that under "[b]oth versions of the Leases . . . and the Memoranda," the tenant's "date of entry into possession was September 22, 2005," which would "render[] the September 21, 2006 recordings timely." Doc. 30 at 28*; see* Doc. 28 at 7.[2] Accordingly, the September 21, 2006 recordings were timely, and those lease renewal options beyond twenty years were not voided by untimely recordation.

Though most of the memoranda were recorded on September 21, 2006, there is one exception: the memorandum for Store 3726. Doc. 30 at 24; Doc. 6-10. The

---

[1] Cites to "Tr." refer to the transcript of the October 8, 2025, motion hearing. *See* Doc. 12.

[2] Circle K does allege that the "Leases were executed on September 23, 2005," Doc. 6 at 13; Doc. 28 ¶ 7, rather than September 22, 2005. But Circle K states that under *Byrd*, "the time for recording under § 35-4-6 does not actually begin until lease commencement," Doc. 6 at 13 n.2, and Circle K does not dispute that the "leases for the stores commenced on September 22, 2005," Doc. 28 ¶ 4.

tenants did not record the memorandum for Store 3726 until September 22, 2006. Doc. 30 at 24; Doc. 6-10. Thus the tenants recorded that memorandum exactly one year after taking the right to possession. *See* Doc. 6-10. The statute requires recording to take place "within one year" of the relevant date. Ala. Code § 35-4-6.

The Alabama Rules of Civil Procedure provide instructions on calculating "any period of time prescribed . . . by any applicable statute." Ala. R. Civ. P. 6(a). The Rule states that "the day of the act, event, or default from which the designated period of time begins to run shall not be included." *Id.* And "[t]he last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday . . . ." *Id.*

September 22, 2005, is the "day of the . . . event . . . from which the designated period of time beg[a]n to run," *see id.*, because it was the day that tenants took the right of possession under the leases. *See* Doc. 30 at 28; Doc. 28 at 7. As such, it is excluded from the time calculation, and the one-year clock began to run on September 23, 2005, ending on September 23, 2006. The day of the week on which September 23, 2006, fell is "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). So the court takes judicial notice that September 23, 2006, fell on a Saturday. September 25, 2006—a Monday—was

the "next day which is not a Saturday, a Sunday, or a legal holiday," as required by Rule 6. Ala. R. Civ. P. 6(a).

Accordingly, the September 21 and 22, 2006, recordings were well before the September 25, 2006, deadline. The lease renewal options were not voided by untimely recordation.

## B. Lease Renewal

Tiger Management and Dakota Properties contend that regardless of the leases' validity, Circle K waived any right to a renewed lease period. Doc. 30 at 32–35; Tr. at 4, 16–17. According to Tiger Management and Dakota Properties, the letters that Circle K sent on May 29, 2025, waived any rights that Circle K had to renew for a new lease term. Doc. 30 at 33–34; Tr. at 4, 16–17.

Circle K responds that by the time it sent the May 29, 2025, letters, the leases had already been renewed. Doc. 33 at 20–21. Circle K alleges that by May 29, 2025, the leases had been renewed in two ways: (1) automatically and (2) expressly. *Id.*

*First*, Circle K contends that the leases automatically renewed "no later than March 26, 2025," making them "fully valid for their entire extended five-year term." *Id.* at 21. The leases all have a clause providing for automatic renewal if Circle K does not give the requisite notice. Doc. 6-1 at 3; Doc. 6-2 at 3; Doc. 6-3 at 3; Doc. 6-4 at 3; Doc. 6-5 at 3; Doc. 6-6 at 3; Doc. 6-7 at 3. The clause states:

> Provided and upon the condition that Tenant shall not then be in default under the terms of this Lease beyond any

applicable grace or cure period, this Lease shall be automatically renewed for six (6) additional five (5) year periods without action on the part of either party hereto. In the event Tenant does not desire to renew this Lease for any of the six (6) five (5) year Renewal Terms, Tenant shall notify Landlord of its intention not to renew this Lease at least one hundred eighty (180) days prior to the termination of the then current Lease period, and in the event such notification is not given by Tenant, this Lease shall be automatically extended as above provided.

Doc. 6-1 at 3; Doc. 6-2 at 3; Doc. 6-3 at 3; Doc. 6-4 at 3; Doc. 6-5 at 3; Doc. 6-6 at 3; Doc. 6-7 at 3. The initial leases were set to run from September 22, 2005, until September 21, 2020, and they each had multiple five-year renewal periods. Doc. 6-1 at 2–3; Doc. 6-2 at 2–3; Doc. 6-3 at 2–3; Doc. 6-4 at 2–3; Doc. 6-5 at 2–3; Doc. 6-6 at 3; Doc. 6-7 at 3.

Prior to the expiration in 2020, Circle K exercised its rights to the first renewal period. *See* Doc. 20-6 at 1 ("[T]he above leases will expire on September 21, 2025 with the expiration of the first 5-year option period. . . . The remaining five, 5-year option periods under each of the leases are therefore void."). It was not until Circle K sought to exercise its rights to the second renewal period that Tiger Management and Dakota Properties objected and maintained that the leases were set to expire on September 21, 2025. *See id.* But under the terms of the lease, if Circle K did not give notice of an intention to terminate the lease within 180 days of September 21, 2025, the leases automatically renewed "without action on the part of either party hereto."

Doc. 6-1 at 3; Doc. 6-2 at 3; Doc. 6-3 at 3; Doc. 6-4 at 3; Doc. 6-5 at 3; Doc. 6-6 at 3; Doc. 6-7 at 3.

Tiger Management and Dakota Properties have emphasized that despite "two years and three months" of "repeatedly press[ing] the case against Circle K that it needed to vacate in September of 2025," "Circle K never responded to these repeated statements of position with any legal counterpoint." Doc. 30 at 32. And as late as March 3, 2025, Circle K gave Tiger Management and Dakota Properties "its official notice to exercise [its] next five-year renewal option" for some of the leases. *See* Doc. 20-10. It was not until May 29, 2025, that Circle K acquiesced to Tiger Management and Dakota Properties's repeated demands. *See* Doc. 21-3; Doc. 21-4. But for the notice to stop the auto-renewal, Circle K had to give it before the end of March 2025—180 days before the lease term expired. *See* Doc. 6-1 at 3; Doc. 6-2 at 3; Doc. 6-3 at 3; Doc. 6-4 at 3; Doc. 6-5 at 3; Doc. 6-6 at 3; Doc. 6-7 at 3. And even if Circle K took no action in response to Tiger Management and Dakota Properties's demands, the leases explicitly state that renewal occurs "without action on the part of either party hereto" if Circle K fails to express its intent to terminate. Doc. 6-1 at 3; Doc. 6-2 at 3; Doc. 6-3 at 3; Doc. 6-4 at 3; Doc. 6-5 at 3; Doc. 6-6 at 3; Doc. 6-7 at 3. Accordingly, the leases automatically renewed in late March 2025. *See Tidwell v. Pritchett-Moore, Inc.*, 12 So. 3d 83, 87 (Ala. Civ. App. 2008) ("Because the automatic-renewal provision is clear and unequivocal, we conclude that the

14

provision is unambiguous and enforceable as written. Accordingly, when [lessee] failed to give the required notice, her lease renewed for an additional year.").

*Second* and separately, Circle K contends that it expressly renewed several of the leases. Doc. 33 at 21; *id.* ¶ 8. On August 15, 2022, Circle K and Dakota Properties renewed the lease for Store 733, extending it through 2030. Doc. 32-2. On December 18, 2024, Circle K gave "its official notice to exercise [its] next five-year renewal option" for Store 726. Doc. 20-7. On March 3, 2025, Circle K did the same for Stores 729, 730, and 732. Doc. 20-10. The record does not reflect express renewal for Stores 727 or 731. *See* Doc. 33 at 8. The automatic renewal of the leases and the repeated attempts to expressly renew the leases, make clear that long before its May 29, 2025, letter, Circle K invoked its renewal rights.

Tiger Management and Dakota Properties reply that Circle K waived its rights to a renewed lease term when it sent the letter on May 29, 2025. Tr. at 4, 16–17; Doc. 30 at 32–35. This argument fails for three reasons. *First*, Tiger Management and Dakota Properties cite no Alabama law that allows for waiver of already-exercised renewal rights. *See* Doc. 30 at 32–35; Tr. at 16–17. *Second*, for waiver to be effective, a party must have an existing right at the time of the purported waiver. *See* Doc. 33 at 20 (first quoting *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 (11th Cir. 2014); and then quoting *Waiver*, Black's Law Dictionary (12th ed. 2024)). Circle K had no renewal right to waive because the leases had already renewed.

*Third*, the renewal rights under the leases, by the lease terms, were not waivable by the May 29, 2025, letter. The leases set a procedure for modification or waiver of their terms. Doc. 6-1 at 29; Doc. 6-2 at 29; Doc. 6-3 at 29; Doc. 6-4 at 29; Doc. 6-5 at 29; Doc. 6-6 at 29; Doc. 6-7 at 29. "None of the terms of th[e] Lease[s] shall be waived or modified to any extent, except by written instrument signed and delivered by both parties." Doc. 6-1 at 29; Doc. 6-2 at 29; Doc. 6-3 at 29; Doc. 6-4 at 29; Doc. 6-5 at 29; Doc. 6-6 at 29; Doc. 6-7 at 29. This procedure was not satisfied by the May 29, 2025, letters. The May 29, 2025, letters were signed by only one party—Circle K. Doc. 21-3; Doc. 21-4; *see also* Tr. at 10 ("There's a provision in leases that say there's not going to be any waiver without a signed instrument . . . signed by both parties and delivered. We don't have that here. It is undisputed that we do not have that here."). Thus, even if postrenewal waiver could have been legally proper, it is not proper here, as the explicit terms for waiver were not met.

Circle K also raises the argument that because its purported waiver was done in reliance on a misunderstanding, the waiver was invalid. Tr. at 10–11; Doc. 33 at 26–27. The court need not address that argument because of its ruling that the leases were not void, and the May 29, 2025, letters were insufficient to waive Circle K's renewal rights.

### C. Petroleum Equipment

The lawsuit before the court began over a dispute about title to the petroleum equipment present on the leased premises. *See* Docs. 1, 17. In anticipation of Circle K leaving the premises, the parties wanted clarity on what Circle K was entitled to take when it left. *See* Docs. 1, 17. Because this court decides that Circle K has valid, renewed leases and is entitled to remain in all leaseholds, all parties agree that the petroleum-equipment issues are not ripe for judicial consideration. Tr. at 18 ("If Circle K has a continued possessory interest for years into the future, I don't think we have a ripe question about petroleum equipment."); *id.* ("[T]he landlords['] purported right to purchase [the] petroleum equipment is conditional on the leases terminating."). Accordingly, Tiger Management and Dakota Properties's claims against Circle K regarding the petroleum equipment are **DISMISSED** as unripe.

## V. CONCLUSION

For the foregoing reasons, Circle K established "that there is no genuine dispute as to any material fact and [that Circle K] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, Circle K's motion for partial summary judgment, Doc. 28, is **GRANTED**. The plaintiffs' motion for partial summary judgment, Doc. 20, is **DENIED**. The court also **DENIES AS MOOT** Circle K's motion for a temporary restraining order and preliminary injunction, Doc. 6.

The court gives the parties thirty days to mediate whatever remains disputed on the issue of unpaid rent. If those mediation efforts are unsuccessful, the court will set a scheduling order to facilitate the timely disposition of the remaining claims.

**DONE** and **ORDERED** this 3rd day of November, 2025.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE